BANCOHIO NATIONAL BANK, Appellant,

v.

NURSING CENTER SERVICES, INC. et al., Appellees.

[Cite as *BancOhio Natl. Bank v. Nursing Ctr. Serv., Inc.* (1988), 61 Ohio App.3d 711.]

Court of Appeals of Ohio,
Franklin County.

No. 88AP–159.

Decided Dec. 22, 1988.

712

*Vorys, Sater, Seymour & Pease, Philip A. Brown* and *James M. Ball,* for appellant.

*Schottenstein, Zox & Dunn, Gary D. Greenwald* and *George Lavdas,* for appellees.

GREY, Judge.

This is an appeal from the Franklin County Common Pleas Court. An exposition of the facts is necessary to understand the legal issues involved here. Phyllis Wilson, Robert Murtha and Marlen Radbill created and were shareholders in Nursing Center Services, Inc. ("NCS–I"), a corporation engaged in selling medical supplies. The three entered into a buy-sell agreement which required that before any of them could sell his shares, he first had to offer to sell them to the company or the other shareholders. The certificates also contained a restrictive legend prohibiting any shareholder from pledging his shares without the written consent of the other shareholders.

Radbill, without the knowledge or consent of the other shareholders, pledged his shares to BancOhio to secure a loan. Radbill went bankrupt, and eventually the trustee in bankruptcy abandoned the shares to BancOhio as the secured party. Murtha and Wilson offered to buy the shares for $45,523.75, but BancOhio refused.

Murtha and Wilson then notified BancOhio of their election to buy the shares under the buy-sell agreement. At this time, March 7, 1986, using the buy-sell agreement formula, Radbill's shares were appraised as having a value of negative $412.56. On March 11, 1986, BancOhio informed NCS–I that it intended to sell Radbill's shares at public sale on March 31, 1986.

On March 14, 1986, Murtha and Wilson created a new corporation called NCS Acquisition ("NCS–II"). They exchanged their shares in NCS–I for shares in NCS–II, and Radbill's shares were cancelled in exchange for $250. On March 27, 1986, the two corporations were merged, with NCS–II as the surviving corporation. BancOhio went ahead with the sale and on March 31, 1986 purchased Radbill's shares for $200,000.

On May 9, 1986, BancOhio sued NCS–I, NCS–II, Wilson, Murtha and Radbill. BancOhio sought to have Wilson's and Murtha's actions rescinded on the grounds that they perpetrated a fraudulent conveyance, and sought to have BancOhio registered as a shareholder on the books of the corporation. On January 28, 1988, after having filed thorough, comprehensive findings of fact and conclusions of law, the trial court entered judgment in favor of all the defendants. BancOhio appeals and assigns three errors.

First Assignment of Error

"The trial court erred as a matter of law in finding no fraudulent conveyance because (A) BancOhio was a creditor of Radbill; (B) the payment of $250 to Radbill by NCS–I in exchange of the 125 shares of NCS–I (which were later cancelled in the merger) is a conveyance within the meaning of R.C. 1336.-01(B); and (C) the conveyance was admittedly undertaken 'to effect the acquisition of Radbill's shares free and clear of BancOhio's security interest' and hinder, delay or defraud BancOhio."

BancOhio argues that the cancellation of Radbill's NCS–II shares in exchange for $250 amounted to a fraudulent conveyance under R.C. 1336.07, since it was undertaken with actual intent to defeat BancOhio's security interest in the stock. We do not agree.

BancOhio relies on R.C. 1336.07, which provides:

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud

either present or future creditors, is fraudulent as to both present or future creditors."

■ The three requisite elements for a fraudulent conveyance under R.C. 1336.07 include (1) a conveyance; (2) with *actual intent to defraud, hinder or delay;* (3) either present or future *creditors.*

The court found that BancOhio failed to meet any of the three requirements. It held that BancOhio was no longer a personal creditor after the February 4, 1986 discharge order of the bankruptcy court; that the cancellation of Radbill's NCS–II stock did not fall within the Uniform Commercial Code's definition of transfer or conveyance; and that there was no evidence that BancOhio was hindered, delayed or defrauded by the action of appellees. The trial court held that neither Wilson nor Murtha had violated R.C. 1336.07.

■ We accept BancOhio's proposition that R.C. 1336.01(B) is quite broad. We accept the proposition that cancellation of shares may constitute a transfer under R.C. 1336.01(B). BancOhio argues that the cancellation of Radbill's NCS–II shares in exchange for $250 was equivalent to a sale to Murtha and Wilson free and clear of its security interest; thus, a conveyance occurred.

R.C. 1336.01(B) defines a "conveyance" as that term is used in the Fraudulent Conveyance Act in the following manner:

"(B) 'Conveyance' includes every payment of money, assignment, release, *transfer,* lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance." (Emphasis added.)

At issue here is whether the cancellation of Radbill's shares in exchange for $250 reasonably may have constituted a "transfer" within the meaning of R.C. 1336.01(B). The trial court found that there was no "transfer" as defined by the Uniform Commercial Code's definition of "transfer" in the context of disposition of securities.

The Official Comment to U.C.C. 8–301, which is analogous to R.C. 1303.22, states that "the concept of transfer is defined only by example (Section 8–313), but it clearly involves the passing of rights in the security from one party to another." Also particularly instructive are the provisions set forth in U.C.C. 8–313 (analogous to R.C. 1308.24), which provide in relevant part that:

"Transfer of a security * * * to a purchaser occurs only [when]:

"(a) * * * he or a person designated by him acquires possession of a certificated security; [or]

"(b) * * * the transfer, pledge, or release of an uncertificated security is registered to him or a person designed by him."

The Official Code Comment states that:

" * * * The word 'only' in the first sentence is intended to provide that the methods of transfer listed are exclusive and that compliance with one of them is essential to a valid transfer. * * * "

We believe that BancOhio interprets the trial court's decision more broadly than that court intended. The trial court did not rule that a cancellation would never constitute a transfer, and indeed we can conceive of situations where such a cancellation is, in fact, a fraudulent conveyance. What the court ruled was that *this* cancellation was not a transfer as contemplated by R.C. 1336.01(B) or 1303.22. We disagree with BancOhio's position that the broad construction given to the Fraudulent Conveyance Act by Ohio courts necessitates that we reach a different outcome. The trial court found there was no "passing of rights" in the stock to Murtha or Wilson, nor was there a transferee inasmuch as Radbill's NCS–I stock was not delivered or endorsed to anyone. The shares were cancelled pursuant to a "plan of merger or reorganization." (Stock Purchase Agreement Section 1.0[b].) See, also, *State, ex rel. Squire, v. Murfey, Blossom & Co.* (1936), 131 Ohio St. 289, 6 O.O. 8, 2 N.E.2d 866.

Even if there had been a valid conveyance of the stock for purposes of R.C. 1336.01(B), the cancellation of Radbill's stock was not done fraudulently, nor did it hinder or delay BancOhio. BancOhio relies heavily upon stipulation of fact No. 37, which it contends is a stipulation of appellees' fraudulent purpose. BancOhio also underscores certain correspondences exchanged between the parties as evidence that the actual intent behind the Radbill–NCS–I transaction and subsequent NCS–I/NCS–II merger was to defeat BancOhio's security interest.

We find that stipulation No. 37 alone is not a stipulation of any fraudulent purpose on behalf of appellees, nor does the other evidence in the record when coupled with stipulation No. 37 indicate that appellees actually intended to defraud BancOhio. BancOhio was well aware that Radbill's NCS–I stock was initially subject to the terms of the buy-sell agreement and then the stock purchase agreement.

Murtha and Wilson gave BancOhio notice of their decision to exercise their option rights under the stock purchase agreement. Murtha and Wilson also immediately informed BancOhio of the cancellation of Radbill's NCS–I stock which occurred prior to the public sale. Hence, there is no indication of any actual intent to deceive or lie. Cf. *Hibbett v. Cincinnati* (1982), 4 Ohio App.3d 128, 4 OBR 220, 446 N.E.2d 832.

It is not fraudulent conduct when appellees' attorney "suggested" to BancOhio that it not attempt a public sale, since, as will be discussed later in

this opinion, BancOhio was in violation of the stock purchase agreement for not releasing the stock at the formula price. After BancOhio refused to release the stock, and in light of the impending public sale of the stock, Murtha and Wilson cancelled the stock in a series of transactions as part of a plan of merger or reorganization.

BancOhio, as pledgee of the stock, certainly held the same rights as Radbill, the shareholder of record, whose interest was subordinate to the restrictions first in the buy-sell agreement, and subsequently in the stock purchase agreement. Cf. *Garner v. First Natl. City Bank* (S.D.N.Y.1979), 465 F.Supp. 372, and *Franke v. Third Natl. Bank & Trust Co.* (1986), 31 Ohio App.3d 189, 31 OBR 416, 509 N.E.2d 955, wherein the court found that a debtor " * * * could give a security interest to the bank in collateral in which he had an interest, he could only give a security interest to the extent that he had an interest. * * * " *Id.* at 190–191, 31 OBR at 418, 509 N.E.2d at 957. Similarly, the pledgee, herein BancOhio, was not a shareholder, did not exercise any shareholder rights, and was on notice that the shares were subject to restrictions in the stock purchase agreement. Accordingly, Banc-Ohio could not place itself in a better position than Radbill, the pledgor. Upon the proper triggering events, the stock purchase agreement provided that Radbill's shares could be purchased at a formula price which BancOhio knew or should have known could have led to the compromise of its collateral. Therefore, BancOhio was subject to the same restrictions as Radbill upon the occurrence of certain "triggering events."

We are not persuaded by BancOhio's policy argument that closely held corporations may be denied credit in the future, especially since BancOhio took the pledge of stock with notice of the first refusal restrictions in the agreement. The more cogent policy argument is that not enforcing legitimate restrictions would discourage the formation of closely held corporations. " * * * Since the main purpose of the * * * [stock agreement] is to prevent undesired persons from gaining a right to share in the management of the * * * corporation, it is unlikely that those who adopted the * * * [agreement] intended that it might be circumvented by the simple device of a pledge and a subsequent sale by the pledgee. * * * " *Monotype Composition Co. v. Kiernan* (1946), 319 Mass. 456, 459, 66 N.E.2d 565, 567. BancOhio's first assignment of error is not well-taken and is overruled.

Second Assignment of Error

"The trial court erred as a matter of law in finding defendants had the power to purchase Radbill's shares and start the merger process because (A) the pledge of shares to BancOhio did not confer purchase rights on defendants under the Stock Purchase Agreement or any other agreement; (B) defendants

waived their rights under the Buy–Sell Agreement; or (C) the Radbill bankruptcy did not confer purchase rights on defendants."

■ Specifically, at issue in the second assignment of error is whether the trial court erred in finding that either the original 1982 stock pledge or the bankruptcy abandonment order triggered the option provisions of the stock purchase agreement, thereby allowing Murtha and Wilson to commence the merger process. If these were not triggering events, then Murtha and Wilson had no contractual authority to exercise their option rights to purchase Radbill's stock.

BancOhio maintains that the stock pledge did not trigger the provisions of the buy-sell agreement and the stock purchase agreement, or that Murtha and Wilson waived their opportunity to exercise their option rights under the agreements. We do not agree. Radbill's pledge of NCS–I stock to BancOhio without the prior written consent of NCS–I, Wilson, or Murtha violated section 1.01 of the buy-sell agreement. Under that section, a pledge is considered a transfer.

■ BancOhio contends that the stock purchase agreement was inapplicable insofar as it was not in effect at the time of the pledge. We find BancOhio's contention to be without merit. Murtha and Wilson properly exercised their option rights under that agreement, since they did not learn of the pledge until March 1983. The stock purchase agreement superseded and replaced the buy-sell agreement in its entirety. BancOhio also contends that the buy-sell agreement never intended that a pledge be a triggering event, since in such a transaction there is no "price" offered by the pledgee to determine the price other shareholders or the company must pay. However, in such event as a pledge transaction, the shareholder is then required to offer a price not to exceed the formula price contained in the buy-sell agreement [sections 2.04, 4.03(b)]. Accordingly, we find that the buy-sell agreement was intended to cover a pledge as a triggering event.

■ .At issue then is whether appellees' failure to exercise their option rights from March 1983 until March 1986 constituted a waiver of such rights. If so, appellees should have been estopped from exercising their option rights to purchase Radbill's NCS–I stock based upon the 1982 stock pledge.

We agree with the trial court's reliance upon *First Natl. Bank of Canton v. Shanks* (C.P.1945), 34 O.O. 359, 73 N.E.2d 93, for the proposition that a shareholder does not waive his stock purchase option even when he fails to exercise the option immediately after learning that the stock had been pledged. BancOhio freely exchanged the NCS–I stock certificate for a new stock certificate, which referred to the restrictions of the stock purchase

agreement. There is no provision in the stock purchase agreement which indicates that the option rights which existed in the buy-sell agreement were extinguished. There was testimony that shareholders Murtha and Wilson believed that BancOhio and Radbill agreed to be bound by the stock purchase agreement. BancOhio held the stock as a secured party and not as a shareholder. It was Murtha's and Wilson's understanding that Radbill intended to receive the stock back after his loan was paid.

As the court noted in *First Natl., supra,* a pledge of stock does not transfer title. The court held that "merely because the other stockholders did not at * * * [the time of the pledge] insist upon the stock being first offered to them, does not destroy the effectiveness of the agreement." *Id.* at 363, 73 N.E.2d at 98. Under the court's analysis in *First Natl.,* only if BancOhio sought to transfer title of the stock to itself or another purchaser or attempted to exercise shareholder rights would NCS–I and the shareholders then have been compelled to exercise or waive their option to purchase. This did not occur. Accordingly, we cannot say that the trial court erred in not finding that there was " * * * an intentional relinquishment, either expressly or constructively, of a known right," by appellees. *Russell v. Fourth Natl. Bank* (1921), 102 Ohio St. 248, 269, 131 N.E. 726, 733.

The trial court also found that the bankruptcy court's abandonment order in 1986 triggered appellees' option rights to purchase Radbill's stock. We find that the trial court erred since there was no transfer or disposition which occurred within the meaning of section 1.0(b) of the stock purchase agreement. The effect of the abandonment was merely to restore Radbill to ownership of the stock as if he had owned the stock continuously. See *Mason v. Commr. of Internal Revenue* (C.A.9, 1980), 646 F.2d 1309. See, also, *In re R–B–Co., Inc. of Bossier* (Bkrtcy.W.D.La.1986), 59 B.R. 43. The 1982 stock pledge, however, constituted a triggering event under the stock purchase agreement, so the trial court's error as to the abandonment order was harmless.

We affirm the trial court's holding that the 1982 pledge triggered the option rights of appellees. Under this "triggering event," there was a transfer to one other than a bona fide purchaser under stock purchase agreement section 4.2. Thus, BancOhio was contractually obligated under sections 4.3 and 6.0 of the stock purchase agreement to offer Radbill's shares to appellees at the formula appraisal price. BancOhio's second assignment of error is not well-taken and is overruled.

Third Assignment of Error

"The trial court erred as a matter of law in holding BancOhio lacked standing to void (A) the sale of the NCS–I shares of Wilson and Murtha to

NCS–II and (B) the subsequent merger of NCS–I into NCS–II which permitted cancellation of the NCS–I shares held by BancOhio as security for Radbill's debt."

BancOhio asserts that the trial court erred in holding that Banc-Ohio lacked standing to assert its breach of contract claims under the stock purchase agreement. BancOhio's argument is not well-taken since BancOhio has never been a shareholder of either NCS–I or NCS–II, and accordingly, lacks standing to sue under that agreement. It is well established that a pledgee of stock cannot sue for alleged wrongful acts by a corporation which occurred when the pledgee was not a shareholder. See *Lewis v. Chiles* (C.A.9, 1983), 719 F.2d 1044, 1047. A corporation is, after all, run for the benefit of its shareholders, not for the benefit of one shareholder's creditors.

Prior to the public sale of Radbill's shares, BancOhio was only a pledgee of Radbill's NCS–I stock. It was not a record shareholder of NCS–I stock nor did it exercise any shareholder rights. There are no provisions within the stock purchase agreement to allow BancOhio to enforce its provisions against NCS–I or its successors. The stock purchase agreement was only binding upon record shareholders. A pledgee does not become a stockholder by mere possession of a stock certificate and shareholder rights are not conferred by a pledge of stock. *Schmuck v. Crume & Sefton Mfg. Co.* (C.P.1905), 19 Ohio Dec. 819, 7 Ohio N.P.(N.S.) 24, affirmed (1908), 78 Ohio St. 409, 85 N.E. 1131. Accordingly, BancOhio did not become a shareholder by the mere pledge of Radbill's shares to it.

BancOhio also did not become a shareholder as a result of purchasing Radbill's stock at the March 31, 1986 auction since the shares had been effectively cancelled previously on March 27, 1986. While BancOhio maintains that Murtha and Wilson breached the stock purchase agreement's notice provisions thereby rendering the cancellation null and void, it ignores the fact that on March 17, 1986, two weeks prior to the auction sale of the shares, NCS–I and its shareholders specifically waived the notice and meeting requirements of the stock purchase agreement. More importantly, however, the contract claims of BancOhio predicated upon alleged breaches of the stock purchase agreement must fail since paragraph 1.0(b) of that agreement indicates that its notice and meeting requirements are inapplicable to a plan of merger or reorganization. Accordingly, insofar as Radbill's NCS–I shares were cancelled prior to March 31, 1986, BancOhio never became a shareholder of NCS–I and, consequently, did not have standing to assert its breach of contract claims. See *Lewis, supra.* See, also, *Davis v. Comed, Inc.* (C.A.6, 1980), 619 F.2d 588. Thus, BancOhio's third assignment of error is not well-taken and is overruled.

For the foregoing reasons, appellant's assignments of error are overruled and the judgment of the Franklin County Common Pleas Court is affirmed.

*Judgment affirmed.*

STRAUSBAUGH and YOUNG, JJ., concur.

LAWRENCE A. GREY, J., of the Fourth Appellate District, sitting by assignment.