OPINION
Defendants-appellants-counterclaimants, Peter S. Kohut, Sr., Peter S. Kohut, Jr., and William Kovachic, appeal a decision of the Belmont County Probate Court denying declaratory and injunctive relief for their claim of ownership of Abe Sebulsky Steel, Inc. against plaintiffs-appellees Aaron Edelman and Stewart Snodgrass, co-executors of the estate of decedent Larry H. Sebulsky (Sebulsky).
Sebulsky owned Abe Sebulsky Steel as a sole proprietorship. Subsequently, in 1995, Abe Sebulsky Steel, Inc. (the Corporation) was organized, at which time 12,000 shares of stock were issued. Appellants were granted a gift of 1,990 shares of stock in the Corporation in 1995. Sebulsky filed a gift tax return for 1995, evidencing that a gift of stock was made. On October 1, 1995, appellants also entered into a stock purchase agreement (Purchase Agreement), prepared by Sebulsky's attorney, Stewart Snodgrass, for the purchase of 1,000 shares of stock each. The agreement provided for annual payments of $10,977.46 until October 1, 2005. Kohut, Sr. and Kohut, Jr. made an initial payment of $10,977.46, and Kovachic made no payments. Thus, each appellant had 2,990 shares of stock each, totaling 8,970 shares, while Sebulsky retained 3,030 shares of stock. Sebulsky was president of the Corporation, Kohut, Jr. was secretary/treasurer, Kohut, Sr. was general manager and vice president, and Kovachic was also vice president.
On January 29, 1997, appellants and Sebulsky together signed a Stock Transfer Restriction Agreement (Restriction Agreement), prepared by Sebulsky's attorney, Snodgrass, restricting the sale or transfer of the shares in the Corporation in order to keep the Corporation closely held. Yet, each appellant then signed an agreement, prepared by Snodgrass, on varying dates — December 29, 1998 (Kovachic), February 5, 1999 (Kohut, Jr.), and May 20, 1999 (Kohut, Sr.) — rescinding the Purchase Agreement and returning all stock certificates to Sebulsky, in exchange for any monies appellants had paid for the stock.
On January 17, 2000, Sebulsky died testate, leaving an estate in excess of twenty million dollars. Appellees filed suit against various defendants in order to marshal the assets of the estate. Appellants counterclaimed seeking a declaration of their rights of ownership to the shares they had previously held in the Corporation. They claimed that 1) they did not freely or voluntarily enter into the agreement transferring the shares back to Sebulsky, or alternatively 2) the transfer back to Sebulsky is void.
The Osiris Temple, a charity and beneficiary of a portion of the residue of Sebulsky's estate, has intervened in this action, and the Ohio Attorney General has intervened on behalf of other charities.
Appellants' counterclaim proceeded to a trial before the court on October 11, 2000. On October 16, 2000, the trial court issued an opinion and decision dismissing appellants' counterclaim and granting judgment in favor of appellees. First, the court found that the transfer of the shares by appellants was not void, because all shareholders had actual notice and failed to object to the transfer, thereby waiving the provision of the Restriction Agreement. Second, the court concluded that appellants were not unduly influenced when they signed the agreement returning the shares to Sebulsky. The trial court found that appellants are intelligent, business-minded men, who tolerated Sebulsky's possibly ill-tempered attitude and continued their business relationships with Sebulsky for years, even challenging past business decisions without any negative consequences. Appellants appeal the first of these trial court holdings, claiming the following assignment of error:
 "THE TRIAL COURT ERRED IN FINDING THAT THE COUNTER-CLAIMANTS WAIVED THE PROVISION OF THE STOCK SALE RESTRICTION AGREEMENT AND IN FAILING TO ORDER THE CO-EXECUTORS TO TRANSFER THE STOCK BACK TO THE COUNTER-CLAIMANTS."
"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. See, also,Gerijo, Inc. v. Fairfield (1994), 70 Ohio St.3d 223, at 226. The court "must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts." Gerijo, 70 Ohio St.3d at 226 (citingSeasons Coal Co., Inc. v. Cleveland [1984], 10 Ohio St.3d 77). "In the event the evidence is susceptible to more than one interpretation, [the court] must construe it consistently with the lower court's judgment."Id.
However, "`[t]he construction of written contracts and instruments of conveyance is a matter of law.' Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. `Unlike determinations of fact which are given great deference, questions of law are reviewed by a court de novo.' NationwideMut. Fire Ins. Co. v. Guman Bros. Farm (1995), 73 Ohio St.3d 107, 108,652 N.E.2d 684, 686; Ohio Bell Tel. Co. v. Pub. Util. Com. (1992),64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287.
"The purpose of contract construction is to discover and effectuate the intent of the parties. [Skivolocki v. E. Ohio Gas Co. (1974),38 Ohio St.2d 244, paragraph one of the syllabus, 67 O.O.2d 321,313 N.E.2d 374.] The intent of the parties is presumed to reside in the language they chose to use in their agreement. Kelly v. Med. Life Ins.Co. (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning. Shifrin v. Forest City Ent., Inc. (1992), 64 Ohio St.3d 635,638, 597 N.E.2d 499, 501. Finally, a contract is to be construed against the party who drew it. Cent. Realty Co. v. Clutter (1980),62 Ohio St.2d 411, 16 O.O.3d 441, 406 N.E.2d 515." Graham v. DrydockCoal Co. (1996), 76 Ohio St.3d 311, 313-314.
In this case, the Restriction Agreement reads in pertinent part:
 "PURPOSE OF AGREEMENT SUPERCEDES PRIOR AGREEMENTS: The Corporation and the Shareholders have executed this Agreement to insure, to the extent possible, that the ownership and control of the Corporation shall continue to be vested in the present Shareholders by imposing on themselves and the Corporation restrictions on the transfer and issuance of shares. This Agreement supercedes any and all prior Stock Transfer Restriction Agreements between the parties hereto.
 "PROVISIONS: In consideration of the mutual promises hereinafter made and intending to be legally bound hereby, the Parties agree as follows:
"I. Prohibition Against Transfer or Issuance.
 "1. Shares now owned or hereafter acquired by the Shareholders shall not be voluntarily or involuntarily transferred in any manner except as permitted by this Agreement. Any attempted transfer violating this Agreement shall be void * * *.
* * *
"II. Right of First Refusal.
"A. Corporation's First Option.
 "1. If any Shareholder desires or attempts to transfer any or all of his shares he shall first offer or if his shares have or will be involuntarily transferred, he shall be deemed to have offered, those shares to the Corporation. Except in the cases of deemed offers, such offers must be in writing and must set forth the name of the proposed transferee and all terms and conditions of the proposed transfer. The offer must be addressed to the Corporation, and may be personally delivered or mailed by registered mail to the President of the Corporation * * *.
 "2. The Corporation shall have the exclusive option, during a period of thirty (30) days from receipt of the offer, to purchase the offered shares on the terms, conditions and price provided in such offer or if such transfer is without consideration being given to the Shareholder for a price of One Dollar ($1.00). * * * The Corporation's acceptance must be authorized by a majority of the Board of Directors, and the offering Shareholder may not participate in any Board action taken in this matter. The Corporation's acceptance shall be made in writing to the offering Shareholder.
"B. Shareholders' Second Option.
 "1. If within the aforementioned thirty (30) days the Corporation rejects or does not accept the offer, then the Corporation, as agent of the offering Shareholder, shall * * * notify the other Shareholders of said offer. If the Corporation does not give notice of the offer to the other Shareholders, the offering Shareholder may notify the other Shareholders directly.
 "2. Each Shareholder shall be entitled to purchase the proportionate number of shares so offered which the number of his shares bears to the total number of shares held by all Shareholders other than the offering Shareholder.
 "3. The Shareholders shall have ten (10) days after the offer is given in which to accept such offer. Acceptance of the offer must be of all the shares which the respective Shareholder is entitled to purchase. Acceptance shall be made in writing to the offering Shareholder and a copy of such acceptance shall be delivered to the Corporation.
 "4. Any Shareholder may elect in his acceptance during such ten (10)-day period to purchase, in addition to the shares to which he was initially entitled, the balance * * * of any shares being offered that are not accepted by other Shareholders. * * *
"* * *
"C. Transfer by Offering Shareholder.
 "If the Corporation or the Shareholders do not purchase all of the offering Shareholder's shares as provided above * * * the offering Shareholder shall then have the right to transfer any remaining offered shares to the proposed transferee according to the terms and conditions of the offer * * *.
* * *
"* * *
"V. Purchase Price of Stock.
 " The purchase price of the shares to be purchased pursuant to this Agreement shall be the book value per share as of the last day of the fiscal year coinciding with or immediately preceding the date on which the shares become subject to purchase.
* * *
"VI. Payment for Shares.
 " Payment for shares purchased in accordance with the terms of this Agreement shall be made as follows:
"A. Lump Sum or Installment Payments.
 "1. Except as provided subsection B below or in ARTICLE II, the Corporation and each of those Shareholders purchasing shares may individually elect to pay their respective portions of the total purchase price in one (1) lump sum or in installments. * * *
"* * *
"VIII. Miscellaneous.
"* * *
"E. Specific Performance.
 "* * * [I]f any Party shall institute any action or proceeding to enforce the provisions hereof, any person (including the Corporation) against whom such action or proceeding is brought hereby waives the claim or defense that such Party has an adequate remedy at law, and such person shall not urge in any such action or proceeding the claim or defense that such remedy at law exists.
"* * *
"I. Arbitration.
 "1. Any dispute arising between the Parties regarding the enforcement or application of this Agreement, except for any issue regarding specific enforcement of any restrictive covenant by injunction, which cannot be amicably resolved, must be submitted to binding arbitration * * *."
Appellants argue that several provisions of the Restriction Agreement were violated by Sebulsky, rendering the stock transfers from appellants to Sebulsky void. First, appellants claim that their shares were not first offered to the Corporation in the manner provided by the Restriction Agreement, because the offer was not delivered or mailed to the corporation in writing, thereby violating Section II A(1). Second, appellants assert that Section II A(2), requiring authorization of the Corporation's acceptance of the offer by a majority of the Board of Directors, was violated, because the corporation never had a meeting of the Board of Directors to discuss the transfer of the stock. Third, appellants find that no party complied with Section II B of the Restriction Agreement, which provides for a second option to purchase by the current shareholders. Rather, according to appellants, no shareholder notified other shareholders that the Corporation did not purchase the stock or were given the option to purchase any amount of the shares. Fourth, appellants argue that the parties were in violation of Section V of the Restriction Agreement, which establishes the purchase price of the shares. Instead, Sebulsky paid the shareholders the amount they had paid when they first purchased the 1,000 shares a few years earlier, and he took back without payment the 1,990 shares he had given as a gift to each shareholder. Moreover, appellants note that Paragraphs E and I of the Restriction Agreement emphasize specific performance, as opposed to an action for damages, and provide an exemption from arbitration when specific performance is requested.
Appellants claim that Sebulsky was primarily responsible for the violations of these various provisions of the Restriction Agreement. To support this assertion, appellants point to the following factors: Sebulsky's attorney Snodgrass prepared the Restriction Agreement; appellants only signed the Restriction Agreement because they were asked to do so; appellants did not really even understand the provisions of the Restriction Agreement; Sebulsky initiated the transfer of the shares back to himself; Snodgrass prepared the agreements returning the stocks to Sebulsky; and these transfer agreements do not expressly rescind the Restriction Agreement as they rescind the Purchase Agreement. For these reasons, appellants believe that Sebulsky was responsible to ensure that he and appellants complied with the Restriction Agreement.
Appellees and intervenor Osiris Temple argue that the Restriction Agreement was not violated and question whether the Restriction Agreement is even applicable to the circumstances at hand. They provide a seemingly more plausible application of the Restriction Agreement's provisions to the transaction returning the shares to Sebulsky. As Osiris Temple notes, the contract was not even designed to apply to stock transfers among current shareholders. Rather, the contract sought to place restrictions on the transfer of the Corporation's stock to outsiders of the Corporation, in order to keep the Corporation more closely held. Thus, the general purpose of the Restriction Agreement was not contravened by the transfer of appellants' shares back to Sebulsky, because the shares were not transferred outside of the Corporation's shareholders. According to Snodgrass, the drafter of the Restriction Agreement, the concept of compliance or noncompliance does not even make sense in this context given the purpose of the Restriction Agreement and "with everyone having knowledge of everything that went on." (Tr. 200.)
Nonetheless, there still appeared to be compliance with the provisions of the Restriction Agreement. Section II A(1) of the Restriction Agreement requires that the first option offer to the Corporation must be addressed to the Corporation and may be personally delivered to the President of the Corporation. Since Sebulsky was the purchaser of the shares, he had the required notice of the transfer as President of the Corporation. If the stocks were indeed involuntarily transferred by appellants to Sebulsky, as appellants have argued, Section A(1) provides that the shares shall be deemed to be offered to the Corporation and are not even required to be in writing. Upon notice, the Corporation then had thirty days to purchase the offered shares "on the terms, conditions and price provided in [the] offer" under Section II A(2). Therefore, the Corporation apparently had the right to purchase appellants' shares for $10,000 and forgiveness of other obligations under the Purchase Agreement. Also, while appellants assert that the Board of Directors should have met to discuss the transfer of the stock, Section II A(2) only requires that a majority of the board authorize the Corporation'sacceptance of the offer, not its rejection as well. Moreover, a formal meeting of the board is not required.
After the Corporation failed to accept the offer within the thirty-day period, the shareholders had a second option to purchase the shares. While appellants argue that the Restriction Agreement was violated because no shareholder notified other shareholders of the second option, Section II B(1) actually states that the offering shareholder "may notify the other Shareholders directly" "if the Corporation does not give notice * * * to the other Shareholders." (Emphasis added.) While notification of the shareholders was therefore not a requirement of the Restriction Agreement, each shareholder still appeared to have "actual notice" of the transfers to Sebulsky, as found by the trial court. Specifically, Kovachic sold his stock to Sebulsky first, and both Kohut, Sr. and Kohut, Jr. knew of the transfer. Kovachic then ceased to be a shareholder and thus his knowledge of subsequent transfers is irrelevant. Kohut, Jr. was the second shareholder to transfer his stock back to Sebulsky, and Kohut, Sr. was aware of this transfer. Kohut, Sr. discussed his knowledge of the transfer:
 "Q.When you signed this agreement in May of 1999, did you have any knowledge as to whether your son, Pete, Jr. and William Kovachic had previously given their stock back to Larry; did you know that?
"A. Yes, sir." (Tr. at 40.)
Kohut, Jr. likewise expressed his knowledge of the transfers:
 "Q.So when you were two payments behind, you entered into an agreement, which is Exhibit D and Number 11 in the exhibits, and you entered into that agreement to transfer all your stock back to Larry for your money back and a cancellation of the stock purchase agreement; is that right?
"A. Yes, sir.
"* * *
 "Q. And you knew what you were signing when you signed Exhibit D, or Number 11, didn't you?
"A. I did.
 "Q. Even told your dad that you had signed your stock over to Larry, didn't you?
"A. Yes sir.
 "Q. You were also aware that Bill Kovachic had signed an identical agreement with Larry [Sebulsky] giving his stock back about a month earlier, weren't you?
"A. Yes, sir.
"* * *
 "Q. * * * Did you ever go to Bill Kovachic and say, I'd like to buy your stock?
"A. No, I didn't
 "Q. Did you ever go to your dad [Kohut, Sr.] and say, I'd like to buy your stock?
"A. No, sir.
"* * *
 "Q. Did you ever say, let's have a meeting and see if the corporation wants to buy the stock?
"A. No, I did not.
 "Q. At the time you signed Exhibit D, you, your father, and Larry Sebulsky were the only stockholders in Abe Sebulsky [the Corporation]?
"A. Right." (Tr. 172 174.)
Thus, despite their knowledge of the transfers of the shares to Sebulsky, appellants did not exercise their option to purchase the shares.
While appellants argue that Sebulsky was primarily responsible for any violations of the Restriction Agreement, the duty to offer the shares first to the Corporation invoked by the Restriction Agreement should fall upon the party offering the shares for purchase, not the purchaser of the shares. Thus, if the express terms of the contract were violated as appellants claim, the violation appears to be due to appellants' breach of duty, not Sebulsky's. While appellants argue that they did not understand the terms of the Restriction Agreement, the trial court found that appellants are "intelligent, business-minded men." Furthermore, failure to understand the terms of an agreement before signing does not constitute a legal defense. See, e.g., ABM Farms, Inc. v. Woods (1998),81 Ohio St.3d 498, 503 (finding that one must read what one signs to be a legal and common-sensical axiom).
Appellees also claim that appellants delayed in asserting that their transfers to Sebulsky should be void until after discovering that they were not included in Sebulsky's will. Appellees believe this delay constitutes waiver of appellant's right to now claim that the transfers were void.
The parties also dispute the correct interpretation of the trial court's specific finding of waiver, which reads: "Since no shareholder objected to said transfer individually or on behalf of the corporation, the Court finds that all [appellants] waived the provision of the Stock Transfer Restriction Agreement." (Emphasis added).
"The term `waiver' has been given various definitions and is used under many varying circumstances. Lawyers might like greater definition but judges are not precise, perhaps deliberately leaving flexibility in the concept and use of waiver. There is no one `correct' definition. Waiver cannot be defined without reference to the kind of circumstances to which it is being related. Nor can we determine the legal operation of a `waiver' without knowing the facts that the term is being used to describe. * * *" 8 Corbin on Contracts (Rev.Ed. 1999) 514, Section 40.1.
According to appellees, waiver in this context means failure to exercise a contractual right, i.e. the failure of appellants to exercise their option or right to purchase the shares under the Restriction Agreement. Using appellees' definition, the above contract analysis is sufficient to justify the trial court's finding of waiver, because it reveals that appellants had a right to purchase that they did not exercise, constituting waiver of the right. This use of waiver can be found in Ohio case law. See, e.g., BancOhio Natl. Bank v. Nursing Ctr.Serv., Inc. (1988) 61 Ohio App.3d 711 (discussing the issue of whether shareholders of corporation waived purchase option rights under stock purchase agreement). Moreover, the trial court attributed the waiver to appellants' lack of objection to the transfer of the shares, which may address appellants' failure to exercise their option.
Contrarily, appellants cite cases discussing waiver as the relinquishment of a right, in which the issue was whether some action of a party contrary to the agreed terms of a contract constituted waiver amounting to a modification of the initial agreement. For instance, the leading case cited by appellants, White Co. v. Canton Transp. Co. (1936), 131 Ohio St. 190, discusses the alleged waiver of required contractual monthly payments due to the acceptance of a lower payment for several months waiver that would essentially amount to a modification of the initial contract. However, as appellees note, the instant case appears to involve failure to exercise an option to purchase rather than noncompliance of an express contractual requirement, and therefore waiver in this case does not amount to modification. Moreover, to support their proposition in their reply brief, appellants misquote the trial court opinion as referring to waiver of "`the provisions [sic] of the Stock Sale Restriction Agreement,' " which appellants find indicates "waiver of theentire agreement." (Emphasis added.) (Appellant's [sic] Reply Brief to the Brief of Plaintiffs-Appellees, Aaron Edelman and Stewart R. Snodgrass, p. 6.). However, the trial court in fact refers only to "theprovision of the Stock Transfer Restriction Agreement," lending support to appellees' contention that waiver, in this case, refers to failure of appellants to exercise a specific contractual right. Because the Restriction Agreement refers to appellants' option to purchase in Section II B, the trial court opinion is more properly construed as referring to waiver of this provision, as opposed to a more general sense of waiver of the Restriction Agreement, implying modification of the agreement, as appellants claim.
Even if appellants' interpretation of waiver were correct, i.e. the trial court really implied that appellants waived their rights under the Restriction Agreement due to noncompliance of the terms of the contract, waiver may still be found using the following four relevant criteria that appellants cite from White Co.:
"1. Waiver as applied to contracts is a voluntary relinquishment of a known right.
"2. Courts move slowly and carefully when the claim is made that a party has waived the terms of a written contract and agreed to different terms by parole, as it amounts to an oral modification of a written contract.
"3. Where a waiver comes after a breach of the original contract by the party claiming the benefit of the waiver, it should receive, not only careful, but serious consideration at the hands of courts, as such an arrangement is diametrically opposed to sound business principles.
"4. He who affirms a waiver must prove it, and in so doing he must prove a clear, unequivocal, decisive act of the party against whom the waiver is asserted, showing such a purpose or acts amounting to an estoppel on his part." Id., paragraphs one, two, three, and four of the syllabus.
First, as the trial court noted, appellants are "intelligent, business-minded" men who appeared to voluntarily[1] relinquish a right they should have known of, considering they signed both the Restriction Agreement and the agreements transferring their shares back to Sebulsky. None of the cases that appellants cite in order to demonstrate lack of waiver involve the actual formation of another agreement as the subsequent conduct in violation of an initial contract, such as the three agreements transferring appellants' shares back to Sebulsky. Second, appellants did not merely orally modify the Restriction Agreement, but indeed entered into an entirely new agreement returning their shares to Sebulsky. Third, as discussed supra, the duty to offer the shares according to the Restriction Agreement should fall upon the party offering the shares for purchase, i.e. appellants. Thus, the party claiming the benefit of waiver in the instant case, i.e. appellees, was not likely the party primarily responsible for any breach of the Restriction Agreement. Fourth, the actual transfer of the shares back to Sebulsky may constitute a "clear, unequivocal, decisive act" by appellants, amounting to waiver. Thus, although appellee's interpretation of waiver as failure to exercise an option is more plausible, the trial court's finding of waiver should be sustained when applying either appellees' or appellants' interpretation of waiver.
Accordingly, appellants' assignment of error is without merit.
The judgment of the trial court is hereby affirmed.
Waite, J., concurs.
DeGenaro, J., concurs.
[1] Appellants did not appeal the trial court's finding of absence of undue influence.